UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

| | | |
|---|---|---|
| PRIDE PUBLISHING GROUP INCORPORATED, | ) ) ) | |
| *Plaintiff*, | ) ) | |
| v. | ) ) | Case No. 1:08-cv-94 |
| JOHN L. EDWARDS, III and ADRIAN J. EDWARDS | ) ) ) ) | Judge Mattice |
| *Defendants.* | ) | |

## **MEMORANDUM AND ORDER**

Before the Court is Plaintiff's Motion for Temporary Restraining Order [Court Doc. No. 6]. By agreement of the parties, the Court will treat Plaintiff's motion as seeking a preliminary injunction pursuant to Federal Rule of Civil Procedure 65(a). For the reasons set forth below, the Court will **DENY** Plaintiff's motion.

**I.  PRELIMINARY INJUNCTION STANDARD**

The standard by which the Court is bound has been described as follows:

> When considering a motion for a preliminary injunction, the district court should consider four factors: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction.

*Rock & Roll Hall of Fame & Museum, Inc. v. Gentile Prods.*, 134 F.3d 749, 753 (6th Cir. 1998) (citing *Sandison v. Michigan High Sch. Athletic Ass'n*, 64 F.3d 1026, 1030 (6th Cir. 1995)).

## II. FACTS

In 1990, Plaintiff Pride Publishing started an "African-American newspaper" identified by the trademark CHATTANOOGA COURIER. (Court Doc. 19, Prelim. Inj. Hrg. Tr. 21.) On June 24, 1992, Plaintiff contracted with Defendant John Edwards for "the operation of the newspaper to be called the COURIER." (Court Doc. 11-2, Contractual Agreement ("Agreement").) None of Plaintiff's owners or employees had worked with Defendant John Edwards before this date. (*See* Inj. Hrg. Tr. 23-24.)

At least by 1998 or 1999, Plaintiff and Defendant John Edwards began to depart from much of the Agreement. Defendant John Edwards was listed as editor and publisher on the paper's tombstone. (*Id.* 89.) He was responsible for funding every aspect of the paper except printing, and was compensated by advertising revenues flowing from accounts he started and maintained. (*Id.* 91.) In exchange, Plaintiffs were allowed advertising space in the paper. (*Id.* 97.) Defendant John Edwards held county business licenses and paid business taxes on the paper. (*Id.* 93.)

In 2005, Defendants took over the layout of the paper. (*Id.* 116.) From August of 2006 to September of 2007, Defendants took over printing (*Id.* 71, 85.) Plaintiff requested that Defendants send it a copy of each published paper for review. (*Id.* 85.) During this time, Plaintiff's state trademark registration lapsed. (*Id.* 57, 67.)

In September of 2007, Plaintiff revoked the agreement allowing Defendants to use the mark (*id.* 58-59). It filed the instant action on April 21, 2008.

**III.    ANALYSIS**

**A.    Subject Matter Jurisdiction**

Defendants contend that the Court lacks subject matter jurisdiction over the instant case because Plaintiff's mark is not registered with the United States Patent and Trademark Office. It is black letter law, however, that § 43(a) of the Lanham Act, 15 U.S.C. §1125(a), protects unregistered marks. *See Tumblebus, Inc. v. Cranmer*, 399 F.3d 754, 760 (6th Cir. 2005). Accordingly, the Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

**B.    Likelihood of Success on the Merits**

1.    <u>Lanham Act Claim</u>

Plaintiff advances a theory of trademark infringement for the mark CHATTANOOGA COURIER. As Plaintiff's mark is not federally registered, § 43(a) of the Lanham Act applies. *See Tumblebus*, 399 F.3d at 760. "When evaluating a Lanham Act claim for infringement of an unregistered mark, courts must determine whether the mark is protectable, and if so, whether there is a likelihood of confusion as a result of the would-be infringer's use of the mark." *Id.* at 761.

a.    <u>Protectable Mark</u>

(1)    *Abandonment Through Naked Licensing*

The Court must first determine whether Plaintiff's mark is afforded protection by § 43(a). Defendants contend that Plaintiff has abandoned the mark, thereby rendering it unprotected by the Lanham Act.[1] "[A] defendant who successfully shows that a

---

[1] Plaintiff argues that Defendants have not properly pled and preserved the issue of abandonment generally, and naked licensing in particular. Defendants' first submission to the Court, however, alleges that Plaintiff "has abandoned any alleged trademark it may own under state or federal law based on the course of conduct and dealings of the parties." (Court Doc. 15, Defs.' Reply to Mot. for Temporary

trademark plaintiff has abandoned a mark is free to use the mark without liability to the plaintiff." *Stilson & Assocs., Inc. v. Stilson Consulting Group, LLC*, 129 Fed. App'x 993, 995 (6th Cir. 2005) (quoting *Cumulus Media, Inc. v. Clear Channel Commc'ns, Inc.*, 304 F.3d 1167, 1173 (11th Cir. 2002)). "Because a finding of abandonment works an involuntary forfeiture of rights, federal courts uniformly agree that defendants asserting an abandonment defense face a 'stringent,' 'heavy,' or 'strict burden of proof.' " *Id.*

Under the Lanham Act, a mark is abandoned "[w]hen any course of conduct of the owner, including acts of omission as well as commission, causes the mark . . . to lose its significance as a mark." 15 U.S.C. § 1127.

> One method by which a mark may be abandoned is through 'naked licensing,' which occurs "[w]hen a trademark owner fails to exercise reasonable control over the use of a mark by a licensee," such that "the presence of the mark on the licensee's goods or services misrepresents their connection with the trademark owner since the mark no longer identifies goods or services that are under the control of the owner of the mark" and the mark can no longer provide "a meaningful assurance of quality."

*Tumblebus*, 399 F.3d at 764 (quoting Restatement (Third) of Unfair Competition § 33 cmt. b (1995)). "Thus, not only does the trademark owner have the right to control quality, when it licenses, it has the duty to control quality." *Ritchie v. Williams*, 395 F.3d 283, 290 (6th Cir. 2005) (internal quotation and citation omitted).

The hallmark of a naked license is the licensor's failure to exercise reasonable control over the use of the mark. *See id.* The licensor must "maintain[] adequate control over the nature and quality of goods and services sold under the mark by the licensee." 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition

---

Injunction ¶ 2.) Defendants' pleading is sufficient to preserve the affirmative defense of abandonment. Fed. R. Civ. P. 8(c)(1). As naked licensing is a form of abandonment, *see Ritchie v. Williams*, 395 F.3d 283, 290 (6th Cir. 2005), the Court will consider the merits of Defendants' argument.

§ 18:42 (4th ed. 2008). In the instant case, the Agreement itself provides little guidance as to how Defendant must use the mark. A lack of an express contract right to inspect and supervise a licensee's operations, however, is not conclusive evidence of lack of control. *Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358, 368 (2d Cir. 1959). Thus, the Court must look to the actual rights of inspection and supervision Plaintiff had over Defendants at the time Defendants took over publication. It is undisputed that during this time, the only supervision Plaintiff exerted was weekly post-publication review. Given all the facts and circumstances, the Court finds this insufficient. For at least one year, Defendants were granted total control over the paper's layout, advertising, management, accounting, and most importantly, its editorial content. Defendants could print and circulate a story before it was reviewed by Plaintiff. Any objections or direction given by Plaintiff could only be levied *after* a story ran. By this time the story would have had its impact and become week-old news. Plaintiff's attempt to shut the editorial barn door after the horse had left would likely have little effect. To be reasonable, Plaintiff must have been able to exert more control over Defendants' editorial process. Unlike manufacturing a product according to a recipe or set of plans, editing a newspaper involves significant and broad discretion on the part of the licensee. This high level of discretion requires a corresponding level of control. The Court finds that Plaintiff's post-publication review does not rise to this level, and is therefore not reasonable under the circumstances.

Plaintiff also argues that it may rely on the prior close working relationship between Plaintiff's employees and Defendants to establish sufficient control. *See Taco Cabana Intern., Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1121 (5th Cir. 1991), *aff'd on*

*other grounds*, 503 U.S. 957 (1992) ("Where the license parties have engaged in a close working relationship, and may justifiably rely on each parties' intimacy with standards and procedures to ensure consistent quality, and no actual decline in quality standards is demonstrated, we would depart from the purpose of the law to find an abandonment simply for want of all the inspection and control formalities."). In *Two Pesos*, two brothers operated a chain of restaurants together for eight years before dividing the business and cross-licensing the appurtenant trade dress. *Id.* In contrast, in the instant case, Defendants had no relationship with any of Plaintiff's employees before the parties entered into the agreement allowing Defendant John Edwards to use the mark. Accordingly, the reasoning in *Two Pesos* is distinguishable and Plaintiff's argument is inapposite. Defendants have put forth sufficient evidence to bear their stringent burden to show that Plaintiff failed to reserve sufficient control over their operation of the newspaper in conjunction with the CHATTANOOGA COURIER mark.

(2)  *Licensee Estoppel*

Plaintiff also argues that Defendants, as licensees, should be estopped from asserting a naked licensing defense. Licensee estoppel may prevent a licensee from pursuing a naked licensing defense based on its own conduct within the license. Restatement (Third) of Unfair Competition § 33 cmt. d (1995). Although the Supreme Court of the United States has done away with licensee estoppel in the patent context, *Lear, Inc. v. Adkins*, 395 U.S. 653, 674 (1969), it has not addressed the doctrine in the trademark context. And while the Court of Appeals for the Sixth Circuit has held that licensee estoppel may apply generally in a trademark license, *Beer Nuts, Inc. v. King Nut Co.*, 477 F.2d 326, 328-29 (6th Cir. 1973) (distinguishing *Lear*), it has not explicitly

addressed the application of the doctrine to the defense of naked licensing. The Sixth Circuit has, however, allowed a licensee to raise a naked licensing defense against a licensor while applying the doctrine of licensee estoppel to bar the licensee's other challenges as to trademark ownership. *E.F. Prichard Co. v. Consumers Brewing Co.*, 136 F.2d 512, 521-22 (6th Cir. 1943). Nonetheless, several district courts within the Sixth Circuit have applied licensee estoppel to a licensee's naked license defense. *See, e.g., Big Boy Rests. v. Cadillac Coffee Co.*, 238 F. Supp. 2d 866 (E.D. Mich. 2002); *Westco Group, Inc. v. K.B. & Assocs., Inc.*, 128 F. Supp. 2d 1082 (N.D. Ohio 2001).

First, the Court notes that Defendant Adrian Edwards is not a party in privity to the Agreement granting Defendant John Edwards license to use the CHATTANOOGA COURIER mark. Accordingly, the doctrine of licensee estoppel cannot apply to him. Whether the doctrine applies to Defendant John Edwards is less clear, given the state of the law of licensee estoppel within the Sixth Circuit.

In *Westco*, the district court discounted the implication of the Sixth Circuit's holding in *E.F. Prichard Co.* based on its lack of an explicit statement clarifying that a naked licensing defense is available despite licensee estoppel; other circuits' application of the doctrine of licensee estoppel to naked licensing defenses; and a thorough review of the rationale behind licensee estoppel. *Westco Group, Inc.*, 128 F. Supp. 2d at 1088-90. This Court is less inclined to overlook the clear implication of *E.F. Prichard Co.* Further, much of the rationale behind licensee estoppel is inapplicable to the instant situation. The district court in *Westco* observed that

> a licensee claiming that its own license is a naked license essentially seeks to benefit from its own misfeasance. By asserting a naked licensing

defense, the licensee contends that the licensed trademark or trade name has lost its significance as a source of origin because the licensor has failed to police the licensee's operations. Thus, by relying on its own ability to offer inferior or nonuniform goods and services under the trademark or trade name, the licensee seeks to free itself of the constraints imposed by the licensor's ownership of the trademark or trade name.

*Id.* at 1089. In the instant case, Plaintiff never imposed any meaningful "constraints" on Defendants' use of the mark. Therefore, Defendants' production of nonuniform goods was not a result of their "misfeasance," or breach of quality-control requirements in the license, but from the lack of any meaningful quality-control requirements in the first place. Further, other facts in the record suggest that Plaintiff lost interest in policing the mark at the same time Defendants took over production. Plaintiff's state trademark registration had lapsed during this time.[2] Given these facts, the Court will not apply the doctrine of licensee estoppel to prevent Defendant John Edwards from raising a naked licensing defense. Restatement (Third) of Unfair Competition § 33 cmt. d (1995) ("licensee estoppel is an equitable doctrine, and a court remains free to consider the particular circumstances of the case, including the nature of the licensee's claim and the terms of the license").

### 2. *Non-Compete Agreement*

Plaintiff also seeks an injunction enforcing the portion of the Agreement in which Defendant John Edwards agrees that "[i]f I am dismissed I agree not to become affiliated in any way with a competing periodical without receiving a waiver of this

---

[2] While state trademark registration has no direct effect on Plaintiff's Lanham Act claims, *see Theodore Rectanus Co. v. United Drug Co.*, 226 F. 545, 553 (6th Cir. 1915) (holding that the effects of state registration are confined to state law), it is probative of Plaintiff's interest in, and protection of, the mark.

- 8 -

agreement from Larry D. Davis." (Court Doc. 11-2.) Defendants raise several challenges to its enforceability. The Court will address each in turn.

### a. Whether the Agreement Remains Binding

Defendants first argue that since the parties no longer adhered to much of the Agreement—including the division of responsibility and compensation provisions—the Agreement is no longer a valid contract. There is no evidence before the Court, however, that either party wished to replace or negate the non-compete clause quoted above. That the parties altered other portions of the Agreement through their course of dealings does not alone void the entire agreement. Under Tennessee law of contracts, applicable here, "the effect of the modification is the production of a new contract, [which] consists not only of the new terms agreed upon but of as many of the terms of the original contract as the parties have not abrogated by their modification agreement." *Arcata Graphics Co. v. Heidelberg Harris, Inc.*, 874 S.W.2d 15, 28 (Tenn. Ct. App. 1993). Accordingly, despite the parties' many changes to their business relationship, there is no evidence before the Court suggesting that the non-compete clause ceased to remain a valid portion of the Agreement.

### b. Enforceability

For a non-competition agreement to be enforceable, however, the non-restricted party must have a "legitimate business interest for the protection of which a restrictive covenant is reasonable." *Hasty v. Rent-A-Driver, Inc.*, 671 S.W.2d 471, 473 (Tenn. 1984). One such legitimate business interest is present "where the employee closely associates or has repeated contact with the employer's customers so that the customer tends to associate the employer's business with the employee." *Id.* In support of its

motion, Plaintiff argues that Defendant John Edwards had close contact with numerous advertisers over the expanse of his relationship with Plaintiff.  The record indicates, however, that it was Defendant John Edwards, and not Plaintiff, who cultivated these relationships.  While Plaintiff submitted advertisements to run in the paper, these merely supplemented advertisements from accounts Defendant John Edwards started and maintained.  While doing so, he acted not as an employee but as an independent contractor.  Although the Court notes that non-compete agreements may also bind independent contractors in Tennessee, *Baker v. Hooper*, No. 03A01-9707-CV-00280, 1998 WL 608285, at 4-5  (Tenn. Ct. App. Aug. 6, 1998), it cannot conclude that Plaintiff has a legitimate business interest in these relationships under these circumstances.[3] *Cf. Dabora, Inc. v. Kline*, 884 S.W.2d 475, 478 (Tenn. Ct. App. 1994) (finding a protectable business interest when a former *employee* had close relationships with the *employer*-periodical's customers).

## IV.   CONCLUSION

For the reasons set forth above, Plaintiff has failed to show a strong likelihood of success on the merits of either its Lanham Act claim or its non-compete agreement claim.  The Court need not, therefore, consider the other factors bearing on whether a preliminary injunction should issue.  Accordingly, Plaintiff's Motion for Temporary Restraining Order [Court Doc. No. 6] is **DENIED**.  The Agreed Order of May 2, 2008 [Court Doc. 16] is **DISSOLVED**.

---

[3]   In so finding, the Court is not placed in the constitutionally questionable position of enjoining Defendant John Edwards from, *inter alia*, submitting works of authorship for publication in a newspaper. The Court need not determine whether such an order would amount to a prior restraint prohibited by the First Amendment.

SO ORDERED this 23rd day of May, 2007.

                                                */s/ Harry S. Mattice, Jr.*
                                                HARRY S. MATTICE, JR.
                                              UNITED STATES DISTRICT JUDGE